George W. Miles v. Commissioner. J. T. Evans Company v. Commissioner.
Miles v. Commissioner
Docket Nos. 5357-63, 5404-63.
United States Tax Court
T.C. Memo 1966-250; 1966 Tax Ct. Memo LEXIS 36; 25 T.C.M. (CCH) 1278; T.C.M. (RIA) 66250; November 9, 1966
E. Burton Kerr, for the petitioners. Dennis C. DeBerry, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: These cases were consolidated for trial, briefing, and opinion. The respondent determined deficiencies in the petitioners' income taxes as follows: Docket No.
Year
Deficiency
5357-63
1960
$31,013.29
1961
3,469.48
Fiscal Year
Ending
5404-63
August 31, 1961
$695.57
These consolidated cases present two issues for our decision: (1) Whether payments by the corporate petitioner in discharge of the individual petitioner's obligations under a contract to purchase stock and in partial discharge of the individual *37 petitioner's estate and inheritance tax liability are constructive dividends; and (2) whether interest expenses incurred on a loan obtained to help the individual petitioner make a cash payment on a stock purchase are deductible by the individual or the corporate petitioner. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioner George W. Miles (hereinafter referred to as Miles) filed an individual Federal income tax return for 1960 and submitted an unsigned return for 1961 with and to the district director of internal revenue, Camden, New Jersey. Petitioner J. T. Evans Company (hereinafter referred to as Evans) filed Federal income tax returns for the fiscal years ending August 31, 1960 and August 31, 1961, with the district director of internal revenue, Camden, New Jersey. Evans was incorporated under the laws of New Jersey. During the years in issue it was engaged in the business of selling fuel, lumber, general hardware and building materials, and Evans kept its books on an accrual method of accounting. On or about March 8, 1948, Miles was hired as the general manager of Evans. Later that year on December 27 *38 he was elected treasurer. Miles continued to hold both of these jobs through January of 1955. At the beginning of 1955 Lee Krauss (hereinafter referred to as Krauss) was the president and majority shareholder of Evans. Evans had 800 shares of Class A common stock outstanding. Krauss owned 450 shares, and his wife Helen K. Krauss (hereinafter referred to as Helen) owned the remaining 350 shares. On January 27, 1955, Krauss died leaving a will naming his widow, Helen, and Evans' auditor Walter L. Petersen, Jr., (hereinafter referred to as Petersen) to be co-executors and testamentary trustees of his estate. Krauss' will (hereinafter referred to as the Will) provided that the decedent's 450 shares of common stock were bequeathed to two separate trusts, one consisting of 12 shares for the benefit of Miles (hereinafter called the Miles trust) and the other consisting of 330 shares for the benefit of Helen (hereinafter called Helen's trust). The 120 shares in the Miles trust were subject to several conditions. The trustees were required to distribute 80 shares to Miles five years after Krauss' death provided that Miles was still employed by Evans and that he had paid all the estate, *39 inheritance and succession taxes on the legacy. During the interim period Miles was entitled to vote the 80 shares and receive the dividends. The trustees held the remaining 40 shares in the Miles trust for the benefit of Helen. She had the power to vote the shares and receive the dividends. After Helen's death the trustees were required to distribute the 40 shares to Miles provided again that he was still working for Evans and that he had paid the estate, inheritance and succession taxes on the legacy. Other conditions of the trust are not here relevant. The Federal estate tax return filed by Krauss' estate valued Evans' stock at $225.90 per share, its book value, and respondent's examining agent accepted this value. On April 9, 1958, Evans redeemed 79 shares of its stock held by Helen's trust at the date of death value of $225.90 per share. On January 27, 1960, five years after Krauss' death, Evans' common stock was owned as follows: George W. Miles
80 shares
Helen K. Krauss
350 shares
Krauss-Petersen, trustees for Helen
251 shares
Krauss-Petersen, trustees for Miles
40 shares
721 shares
Late in 1959 and early in 1960 Miles discussed at various times *40 with the majority shareholders (hereinafter sometimes called the Petersen-Krauss interests) the possibility of his acquiring their entire interest in Evans. Miles and the Petersen-Krauss interests hired separate lawyers to conduct the negotiations. The parties agreed that the true value of Evans was $135,000. They further agreed upon a value of $120,000 for the majority interest (89 percent of the stock) and $15,000 for Miles' minority interest (11 percent of the stock). Miles and the Petersen-Krauss interests entered into a contract on June 16, 1960, (hereinafter called the Agreement) providing that Miles would purchase all of their stock and that he would be personally liable for the purchase price of $120,000. The pertinent parts of the Agreement follow: This Agreement made this 16th day of June, 1960, by and between HELEN K. KRAUSS and WALTER L. PETERSEN, JR., Executors and Trustees under the Will of Lee KRAUSS, Deceased, and HELEN K. KRAUSS, individually, hereinafter sometimes referred to as SELLERS, and GEORGE W. MILES, hereinafter referred to as BUYER. WITNESSETH WHEREAS, J. T. EVANS CO, is a corporation of the State of New Jersey in good standing; and WHEREAS, J. *41 T. EVANS CO. is possessed of certain assets and is obligated under certain liabilities, as more particularly set forth in the most recent Financial Statement of said corporation, a copy of which is attached hereto and made a part hereof; and WHEREAS, the total issued and presently outstanding stock of J. T. EVANS CO. consists of 721 shares of class "A" no par value common stock, 350 shares of which are owned by Helen K. Krauss individually, and title to the remaining 371 shares are presently held by Helen K. Krauss and Walter L. Petersen, Jr. as Executors and Trustees under the Will of Lee Krauss, deceased, who died on January 27, 1955; and WHEREAS, BUYER is presently the equitable owner of 80 shares of said 371 shares of J. T. Evans Co. stock under the terms of Item VIII(b) of the Will of Lee Krauss, deceased, and is entitled to have said 80 shares transferred and delivered to him upon his payment to the Executors and Trustees under the Will of Lee Krauss, deceased, of all estate, inheritance and succession taxes on the gift of said stock (as provided in Item XIV of said Will); and BUYER also has an equitable contingent remainder interest in an additional 40 shares of said 371 *42 shares of J. T. Evans Co. stock under the terms of Item VIII (c) of said Will; and WHEREAS, BUYER desires to acquire all of the outstanding stock of J. T. Evans Co. and is willing to pay (as hereinafter set forth) a total consideration of $120,000 for the 350 shares owned by Helen K. Krauss Individually, plus the 291 shares of stock owned by said Executors and Trustees (in 40 shares of which BUYER has an equitable contingent remainder interest of uncertain and indefinite value), but said Executors and Trustees are unwilling to sell their stock for less than $225.90 per share, which has been determined to be the date of decedent's death value of said stock and the value on which Federal Estate Tax was paid on the 291 shares still owned by said Executors and Trustees, or a total price (291 X $225.90) of $65,736.90; and Helen K. Krauss desires to sell her own 350 shares of said stock and is willing to sell it for the difference between $120,000 and $65,736.90, i.e., for a total price of $54,263.10; and WHEREAS, Helen K. Krauss desires to sell to BUYER, and he desires to purchase, the 350 shares of said stock owned by her individually for said price of $54,263.10, and also desires *43 to relinquish to BUYER any and all equitable interest she has in the 40 shares of stock in which BUYER has an equitable contingent remainder interest, such relinquishment to occur when BUYER (1) pays to said Executors and Trustees all estate, inheritance and succession taxes (if any) on the gift of decedent to BUYER of said equitable contingent remainder interest in said 40 shares, and (2) performs paragraph 4 of this agreement; and the named Executors and Trustees under the Will of Lee Krauss, deceased, desire to sell to BUYER, and he desires to purchase, the 251 shares of said stock owned by them, plus the additional 40 shares of stock owned by them in which buyer has an equitable contingent remainder interest (or a total of 291 shares) for said price of $65,736.90; and WHEREAS, BUYER desires to buy all of the 641 shares of the capital stock of J. T. Evans Co. from the aforesaid sellers and further desires to use, in order to pay a portion of the purchase price for said stock, a portion of the surplus and/or a portion of the paid-in capital of the J. T. Evans Co., which may be hereafter reduced by him in accordance with statute: * * *
1. SELLERS agree to sell and BUYER agrees *44 to buy 641 shares of the capital stock of J. T. EVANS CO., a corporation of the State of New Jersey, upon the express representation that the ownership and quantum of ownership is as set forth in the recitals to this Agreement. SELLERS shall cause the said 641 shares of corporate stock of J. T. EVANS CO. to beassigned, transferred and delivered to BUYER simultaneously with the execution of this Agreement (provided, however, with respect to 40 shares of said stock that BUYER shall pay to said Executors and Trustees, prior to the delivery of said 40 shares, all estate, inheritance and succession taxes (if any) on the gift in Item VIII (c) of the Will of Lee Krauss, deceased, to BUYER of an equitable contingent remainder interest in said 40 shares); at which time BUYER shall immediately assign back said stock to the SELLERS as security for the full payment of the total purchase price, including the full payment of any and all mortgages and notes specified in paragraph 4 of this Agreement. * * *
4. BUYER agrees to pay to SELLERS as the purchase price of said 641 shares of stock the sum of One Hundred Twenty Thousand Dollars ($120,000.00) within ten days from the date of this Agreement, *45 as follows: a. Sixty Thousand Dollars ($60,000.00) in cash in check form, made payable as directed by SELLERS. b. Forty Thousand Dollars ($40,000.00) by purchase money bond and mortgage on all real estate owned at this time by J. T. EVANS CO. Said bond and mortgage shall be for a term of five years and one month and shall bear interest at the rate of six per centum (6%) per annum, and shall provide for payments in reduction of principal, in the sum of Five Hundred Dollars ($500.00) quarterly for a term of five (5) years, and shall provide for payment of the entire balance of $30,000 at maturity. This mortgage shall be insurable by a reputable title company and the cost of such title insurance shall be paid by BUYER. c. Twenty Thousand Dollars ($20,000.00) by promissory note payable as directed by SELLERS with interest at 6% per annum, payable in twenty-four (24) equal monthly amortized payments of principal and interest. * * *
6. The parties further agree to do any other acts and things which may be found necessary to accomplish the purpose of this Agreement. IN WITNESS WHEREOF, the parties have hereunto affixed their hands and seals the day and year first above written. *46 /s/ Helen K. Krauss, Exec. & Trustee (L.S.) Helen K. Krauss, Executor and and Trustee Under Will of Lee Krauss, Deceased /s/ Walter L. Petersen, Jr., Exec. & Trustee (L.S.) Walter L. Petersen, Jr., Executor and Trustee Under Will of Lee Krauss, Decreased /s/ Helen K. Krauss (L.S.) Helen K. Krauss, Individually /s/ George W. Miles (L.S.) George W. Miles At the time the Agreement was executed, Miles received the 641 shares of stock which he returned the the Petersen-Krauss interests to be held in escrow as security for the payment of the purchase price. Five days after the Agreement was signed, on June 21, 1960, the board of directors of Evans met and elected Miles president and treasurer. The minutes of this meeting state, inter alia: George W. Miles further requested that there be spread upon the minutes copies of all instruments including agreements, mortgages, resolutions, bonds and warrants, affidavits and other related data dealing with the purchase by him of all of the capital stock of the corporation, and further that the accountant for the corporation be instructed to reshape the financial statement so as to cause a reduction in the capital stock by way *47 of the entry therein of treasury stock for so much of the corporate assets as form the purchase price of the underlying transaction. [Emphasis supplied.] Pursuant to the terms of the Agreement Miles executed a personal promissory note for $20,000 with interest at 6 percent. The note was dated June 21, 1960, and Miles gave a bond and warrant as security. Evans made all the payments including interest on this $20,000 personal note. Evans gave a mortgage on its real estate to Helen individually with a bond and warrant dated June 21, 1960, signed by Miles as president of the company. Evans made all of the payments on this mortgage. Evans also made the $60,000 cash payment required by the Agreement with checks drawn on its bank account. On August 29, 1960, Evans and Miles, acting in concert, borrowed $20,000 from the Cinnaminson Bank and Trust Company to assist Miles in acquiring Evans' stock from the Petersen-Krauss interests. A chattel mortgage, a note and pledge agreement covering inventory, accounts receivable and Miles' 80 shares of stock were security for the loan. Miles signed the note individually and also as president of Evans. Evans treated this loan as a corporate liability *48 and deducted the interest on it in the amount of $2,318.56, which it paid in fiscal year ended August 31, 1961, as a corporate expense. Miles was personally liable for the entire purchase price of $120,000 set out in the Agreement. Evans made all of the payments necessary to acquire the stock including expenses for interest, legal fees and title insurance. Evans also made two payments of $500 and $849.18 for part of the estate, inheritance, and succession taxes attributable to Miles' legacy under the Will. Miles did not sign any note to Evans for these advances. He did not repay any of these advances, nor did he ever intend to. Miles acquired complete ownership of Evans' common stock without expending any of his personal funds. At an undetermined time after the Agreement was executed, Petersen set up a general ledger account entitled "Special Advances - G. W. Miles" on Evans' books. All of Evans' advances on behalf of Miles were recorded here. During 1960 Evans' advances on behalf of the petitioner, for the purposes outlined above, totaled $69,709.74. During 1961 the figure was $12,340.54. The respondent determined that these payments constituted constructive dividends to *49 Miles. During these two years Evans had earned surplus and undivided profits in excess of $100,000. Opinion The first and principal issue in this case is whether the payments made by Evans in discharge of Miles' contractual obligation to purchase the majority shareholders' stock are taxable to Miles as constructive dividends. The petitioners contend that the transaction in substance amounted to a complete redemption by Evans of the majority shareholders' stock, and that Miles was merely acting as the agent of Evans in purchasing this stock. The petitioners rely upon section 302(b)(3) of the 1954 Code [1] providing that any redemption of stock shall be treated as a sale of stock if it "is in complete redemption of all the stock of the corporation owned by the shareholder." The respondent argues that the parties to the Agreement did not intend a corporate redemption of this stock but rather intended merely to have Miles purchase it. The respondent contends that the payments in issue operated to relieve Miles of his contractual obligation to pay for the stock and thus are taxable to him as a constructive dividend. We think that the evidence before us and the form of the transaction, *50 when considered in the light of applicable legal principles, compel a decision for the respondent on this issue. The question presented is basically one of fact. Cf. (C.A. 7, 1944); , affirmed per curiam (C.A. 6, 1960); (C.A. 4, 1947); , affirmed per curiam (C.A. 6, 1958); (C.A. 6, 1955), affirming a Memorandum Opinion of this Court. The basic question in this case is whether the transaction in issue amounted to a purchase by Miles of the stock or whether Evans purchased the stock pursuant to a plan to redeem it. The evidence is overwhelming that Miles simply intended to buy all of the majority shareholders' stock with Evans footing the bill. In this posture of the facts, "It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction *51 taxpayers have chosen or from any other form they might have chosen, whichever is less." (C.A. 2, 1960), affirming . Miles' dominant and overriding purpose in arranging the purchase was his desire to acquire complete ownership of the company. We note that the Agreement is void of any reference to Evans as a principal party to the transaction. Miles and only Miles is designated as the "Buyer" in the Agreement. Miles signed the document as an individual and not as an agent or an officer of Evans. The Agreement is silent about any redemption or even a subsequent purchase of this stock by Evans. Both parties to the Agreement were represented by counsel, and we think that if the parties had intended the transaction to be a corporate redemption, the Agreement would have said so. Furthermore, Miles and Petersen testified that during the negotiations it was always understood that Miles, not Evans, was to purchase the stock. On cross-examination Miles was asked: Q. Did the corporation intend to take the stock - to purchase the stock? A. No; I, as an individual did, sir. Petersen testified *52 to the same effect, to wit: Q. As far as you were one of the parties to the agreement as co-trustee, you were selling the stock to Mr. Miles, were you not? A. No question about it. The Agreement created an unconditional obligation on Miles to pay the full purchase price of $120,000 for the stock. He was given the right to cause Evans to issue a purchase money mortgage on its real estate to raise part of the cash payment, but the financial obligation was his alone. In fact Miles paid no part of the purchase price. Over a two-year period Evans paid his entire obligation. There is no convincing evidence that Evans intended to redeem the stock at time of the purchase, or, indeed, that the stock was ever in fact redeemed. On June 21, 1960, five days after the Agreement was signed, the board of directors of Evans met. The minutes of this meeting refer to "the purchase by * * * [Miles] of all of the capital stock of the corporation," but there is no reference to any corporate plan to redeem this stock. There is only a vague and ambiguous reference to a future revision of the company's "financial statement so as to cause a reduction in the capital stock by way of the entry therein *53 of treasury stock for so much of the corporate assets as form the purchase price of the underlying transaction." One of the petitioners' principal arguments on this issue is that the parties to the Agreement knew that a substantial part of the purchase price would have to come from Evans because of Miles' limited financial resources. However, the mere fact that Miles intended to have Evans pay for the stock is not proof that the company necessarily intended to redeem such stock. Miles testified that these 641 shares were in fact redeemed by Evans in August of 1962, but his testimony is unsupported. When Miles was shown Evans' stock record book at the hearings he acknowledged that there was "no indication" that the shares had been canceled. He further admitted that the shares had never been endorsed. Evans' income tax returns for the fiscal years ending August 31, 1960, and August 31, 1961, contain a reference to a readjustment of "the capital structure of the company" but this is not proof of a plan to redeem the stock. An agent of the respondent examined Evans' "books and records for income tax purposes" in June of 1962 and found no evidence of a corporate plan to redeem or retire *54 this stock. We think that our decision is compelled by the cases of ; and In Wall the taxpayer owned half of the corporation's outstanding stock and purchased the other half for cash and a series of notes. He transferred this newly acquired stock to the corporation which entered this stock on its books as treasury shares. When the taxpayer fell into default in paying the purchase price, the corporation made the payments for him. In holding the payments to be constructive dividends to the taxpayer, the court said at p. 464: The controlling fact in this situation was that Wall [the buyer] was under an obligation to pay Coleman [the seller] $5,000 in the tax year and that Rosedale [the corporation] paid this indebtedness for Wall out of its surplus. It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. * * * In the Zipp case a father transferred all of his shares in a corporation to his two sons who paid for the stock with corporate funds. This Court found that the purpose of the transaction was to enable *55 the sons to purchase their father's interest in the company and treated the corporate payments as dividends to the sons, saying at p. 329: In effect, they caused Paramount's [the corporation's] cash to be distributed for their benefit, i.e., to purchase all of Louis's [their father's] stock. It is clear that no loans were made by Paramount to Monroe and Bernard [the sons]. The arrangements had the same effect as though the sole stockholders [the sons] had withdrawn funds from Paramount for their own use and benefit. Such withdrawals would be taxable as dividends to Monroe and Bernard. * * * [citing Wall] Some limitations on the broad sweep of the Wall decision have been subsequently developed by the courts, but none is applicable to the facts of the instant case. In , the taxpayer convinced the court that he was merely the corporation's conduit for the redemption of the stock, a finding precluded by the facts in the instant case. In , the surviving shareholders bought stock from two deceased shareholders' estates and immediately transferred it to the corporation, which paid them the same amount for the *56 stock they had paid the estates. In , the purchase of the stock by the shareholder and its redemption by the corporation were integral parts of a single transaction. In the instant case there is no real evidence that the stock was ever redeemed; if it was, it happened more than two years after the purchase in question. The second issue is whether interest expenses paid by Evans on the $20,000 loan which was obtained to help Miles pay part of the purchase price are deductible by Evans as an ordinary and necessary business expense. The parties are agreed, and so are we, that this question is dependent on our resolution of the first issue. The respondent disallowed the deduction because the expense was not incurred for a business purpose of Evans. The respondent treated the payment as a constructive dividend to Miles because it was made for his benefit. We agree. Decisions will be entered for the respondent. Footnotes
1. All Code references are to the Internal Revenue Code of 1954.↩